**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
**CLIMATE INVESTIGATIONS CENTER,**          )
                                            )
    **Plaintiff,**                         )
                                            )
        **v.**                           )     **Case No. 16-cv-124 (APM)**
                                            )
**UNITED STATES DEPARTMENT**                )
**OF ENERGY,**                              )
                                            )
    **Defendant.**                         )
_____ )

## MEMORANDUM OPINION AND ORDER

Plaintiff Climate Investigations Center requested information from Defendant Department of Energy under the Freedom of Information Act ("FOIA") concerning the funding and development of the "Kemper Project," a power plant in Mississippi that uses "clean coal" technology. Defendant provided Southern Company, a private developer, with federal funding to construct the power plant and implement the new technology. Before the court are the parties' cross-motions for summary judgment, in which the parties dispute the adequacy of the search performed and the appropriateness of Defendant's decision to withhold certain materials responsive to Plaintiff's request.

After thorough review of the record and the parties' briefs, the court concludes that summary judgment is not warranted because there remain material issues of fact concerning the adequacy of Defendant's search and the appropriateness of its withholdings pursuant to FOIA Exemptions 4 and 5. The dispute concerning Exemption 6, however, is moot, because the withheld material is publicly available. Accordingly, the court denies both motions for summary judgment.

## I.   BACKGROUND

In the early part of 2015, Dan Zegart, a senior investigator for Plaintiff Climate Investigations Center, submitted a request to Defendant Department of Energy for information regarding the funding, construction, and implementation of "clean coal" technology over a fourteen-year period at a particular power plant in Mississippi—an initiative known as the "Kemper Project."  *See* Pl.'s Cross-Mot. for Partial Summ. J., ECF No. 15 [hereinafter Pl.'s Cross-Mot.], Attach. 2, ECF No. 15-2 [hereafter Zegart Decl.], ¶ 1; Pl.'s Cross-Mot., Attach. 3, ECF No. 15-3 [hereinafter Pls.' Exs. A–L], at 1–7 (Exs. A & B).   The Kemper Project is overseen, in part, by Defendant's subcomponent, National Energy Technology Laboratory ("NETL"), and being developed, in part, by Southern Company and Mississippi Power Company, a wholly owned subsidiary of Southern Company.  *See* Def.'s Mot. for Summ. J., ECF No. 13 [hereinafter Def.'s Mot.], Attach. 1, ECF No. 13-1, ¶¶ 2, 5; Pl.'s Cross-Mot., Attach. 5, ECF No. 15-5, ¶¶ 2, 5. Defendant awarded Southern Company nearly $300 million to carry out work on the Kemper Project.   Am. Compl., ECF No. 3 [hereinafter Am. Compl.], ¶¶ 16–17; Def.'s Answer, ECF No. 6, ¶¶ 16–17.   Plaintiff's FOIA Request sought any and all communications relating to the "development, funding and/or construction and implementation of 'clean coal' technology" at the Kemper Project, including details concerning the technology developed for the plant and the decision to build it in Kemper County, Mississippi.   *See* Pls.' Exs. A–L at 1–7 (Exs. A & B).

Plaintiff submitted its request directly to NETL, which began the search for responsive documents.   *See id.*; Def.'s Mot., Attach. 3, ECF No. 13-3, at 1–16 [hereinafter Dunlap Decl.], ¶ 7.  NETL's FOIA Officer, Ann C. Dunlap, determined that NETL's Gasification Technology Manager and Major Demonstrations Project Office were the places most likely to have responsive documents.   Dunlap Decl. ¶¶ 1, 8–9, 14–15.

On June 30, 2015, Plaintiff clarified that it sought six categories of documents.[1]   Generally speaking, Plaintiff sought documents and records of communications from the period of January 1, 1998, to December 31, 2011, concerning (1) contacts or meetings between NETL and Southern Company, or entities related to Southern Company, about clean coal technology; (2) the research and development of clean coal technology at an NETL research facility in Wilsonville, Alabama; (3) the decision to move the Kemper Project site from Florida to Mississippi; and (4) any connections between the Kemper Project and a lobbying firm called the BGR Group.   *See* Def.'s Mot., Attach. 4, ECF No. 13-4 [hereinafter Def.'s Mot., Attach. 4], at 13–17 (Ex. B).

Early in its search, in August 2015, NETL contacted Defendant's Headquarters ("DOE Headquarters") on the belief that DOE Headquarters had materials responsive to certain categories of documents in Plaintiff's request.   *See* Def.'s Mot., Attach. 4, at 1–9 [hereinafter Morris Decl.], ¶ 10.   DOE Headquarters, in turn, determined the Office of Fossil Energy was the agency subcomponent most likely to have records responsive to Plaintiff's request and directed that office to conduct a search for those materials.   *See id.* ¶¶ 12, 14.   Staff at the Office of Fossil Energy both manually and electronically searched their files, collected all responsive materials therein, and submitted them to the Office of Information Resources ("OIR") for review.   *Id.* ¶¶ 18–19. OIR, in turn, reviewed the materials submitted, removed duplicate documents NETL already provided to Plaintiff, consulted with Southern Company to determine which portions of the documents could cause the company harm if disclosed, and redacted those portions of the responsive documents OIR believed were exempt from disclosure.   *Id.* ¶¶ 20–22; Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J., ECF No. 18 [hereinafter Def.'s Opp'n], Attach. 3, ECF No. 18-3,

---

[1] The full text of Plaintiff's clarified request is set forth in an Appendix to this Memorandum Opinion and Order.

at 1–3 [hereinafter Suppl. Morris Decl.], ¶¶ 7–10. In total, the Office of Fossil Energy released 75 records with some redactions. Morris Decl. ¶ 23.

NETL began producing responsive materials shortly after receiving the clarified FOIA Request. Between July 7, 2015, and September 28, 2016, NETL sent Plaintiff at least six different sets of materials, though certain productions only came about after Plaintiff successfully administratively appealed the agency's invocation of particular FOIA exemptions from disclosure. *See* Dunlap Decl. ¶¶ 17–19, 21, 23–25, 27–32, 37–40. In making its productions, NETL consulted with DOE Headquarters regarding materials that pertained to the Office of the Secretary. *See id.* ¶ 32. Additionally, because NETL's search identified documents that potentially implicated Southern Company's business interests, NETL consulted with Southern Company to evaluate how disclosure of certain responsive materials might harm the company. *Id.* ¶¶ 23, 41. Southern Company supplied the agency with its stance on the records' disclosure, but the agency independently determined whether withholding the document in full, in part, or not at all, was appropriate. *See* Def.'s Opp'n, Attach. 2, ECF No. 18-2, at 1–3 [hereinafter Suppl. Dunlap Decl.], ¶¶ 7–10. In total, NETL released several thousand pages of documents, many with redactions, to Plaintiff. *See* Dunlap Decl. ¶¶ 17, 19, 21, 23, 27, 32, 37–40 (describing multiple productions totaling more than six thousand pages).

Dissatisfied with the productions and redactions, Plaintiff filed suit in this court. *See* Compl., ECF No. 1 (filed Jan. 26, 2016). Plaintiff's Amended Complaint challenges Defendant's search as inadequate and its redactions as unsupported by any exemption. *See* Am. Compl. ¶¶ 36–52. The parties submitted cross-motions for summary judgment that are now ripe for review. Defendant moves for summary judgment as to the adequacy of its search and all its withholdings under Exemptions 4, 5, and 6. *See* Def.'s Mot. Plaintiff seeks summary judgment

on all issues except Defendant's reliance on Exemption 4, as to which Plaintiff believes material issues of fact remain. *See* Pl.'s Cross-Mot.

## II.    LEGAL STANDARD

On a motion for summary judgment, a court must enter judgment in favor of the moving party if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view all the evidence in the light most favorable to the nonmoving party. *See id.* As a general matter, "[i]n FOIA cases, an agency defendant may be entitled to summary judgment if it can demonstrate that (1) no material facts are in dispute, (2) it has conducted an adequate search for responsive records, and (3) each responsive record that it has located has either been produced to the plaintiff, is unidentifiable, or is wholly exempt from disclosure." *Mattachine Society of Wash., D.C. v. U.S. Dep't of Justice*, No. 16-773, 2017 WL 3251552, at *2 (D.D.C. July 28, 2017).

An agency performs an "adequate search" and may be awarded summary judgment when it performs a search "reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency bears the burden of proving that it performed an adequate search, and it may rely on sworn affidavits or declarations to make that showing. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). The court may grant summary judgment to the agency based on those materials if they are reasonably specific and contradicted by neither other record evidence nor evidence of agency bad faith. *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Beltranena v. Clinton*, 770 F. Supp.

2d 175, 181–82 (D.D.C. 2011). FOIA plaintiffs can rebut an agency's declarations and affidavits by demonstrating, with "specific facts," that there remains a genuine issue as to whether the agency performed an adequate search for documents responsive to the plaintiff's request. *See Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (internal quotation marks omitted). The court will not grant summary judgment if "review of the record raises substantial doubt [as to the adequacy of the search], particularly in view of well defined requests and positive indications of overlooked materials." *Aguiar v. DEA*, 865 F.3d 730, 738 (D.C. Cir. 2017) (internal quotation marks omitted).

The agency also bears the burden of proving that it properly withheld certain materials responsive to a plaintiff's FOIA request pursuant to an exemption from disclosure. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.D.C. 2014). Once more, the agency may rely on affidavits and declarations to make this showing. "If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without in camera review of the documents.'" *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009)).

## III. DISCUSSION

Plaintiff challenges Defendant's response to its FOIA Request on two grounds: (1) the search Defendant performed was inadequate; and (2) Defendant improperly relied on Exemptions 4, 5, and 6 to withhold responsive documents. The court addresses each contention in turn.

### A.       Adequacy of the Search

Plaintiff claims that Defendant's search was inadequate because Defendant did not separately search the Office of the Secretary or use proper search terms when searching the Office of Fossil Energy.    Specifically, Plaintiff argues that Defendant should have conducted a standalone search of the Office of the Secretary because the materials Defendant produced included documents and correspondence originating from that Office, which indicates additional responsive records could be found there.    *See* Pl.'s Cross-Mot., Attach. 1, ECF No. 15-1 [hereinafter Pl.'s Mem.], at 26–27.    Additionally, Plaintiff submits that Defendant needed to use "the names of Southern Company officers involved in the deal with DOE, email domains from Southern Company or Mississippi Power, or even the name of the plant" as search terms when locating responsive material within the Office of Fossil Energy.    *Id.*

Defendant submits that FOIA did not require it to search the Office of the Secretary or employ other search terms when searching the Office of Fossil Energy.    Regarding a search of the Office of the Secretary, Defendant cites the declarations of Alexander Morris, the FOIA Officer at DOE Headquarters, and Ann Dunlap, the FOIA Officer at NETL, to support its position that a separate search was unnecessary because it would be duplicative of prior searches.    Specifically, Defendant explains, the declarations show that the "the Office of Fossil Energy at DOE HQ searched for executive correspondence within the Office of the Executive Secretariat, which would have captured any and all communications involving the Office of the Secretary regarding the Kemper project," and "NETL too conducted a search that captured communications with the Office of the Secretary."    Def.'s Opp'n at 13.    Regarding the adequacy of the search terms used to search the Office of Fossil Energy, Defendant cites Mr. Morris' declaration and notes that the

Office of Fossil Energy did search for "Kemper," the name of the plant, as well as all the other search terms Plaintiff requested. *Id.* at 14–15.

The court first concludes that Defendant was not obligated to use additional or alternative search terms when searching the Office of Fossil Energy. As a general matter, a plaintiff cannot dictate the search terms an agency must use to identify responsive records, and when an agency's search terms are "reasonably calculated to lead to responsive documents, a court should neither 'micromanage' nor second guess the agency's search." *Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015). Here, Defendant directed the Office of Fossil Energy to search for materials responsive to the fifth and sixth categories of documents in Plaintiff's clarified FOIA Request—documents pertaining to the decision to build the plant in Kemper County and communications with the BGR Group, including Haley Barbour, Ed Rogers, Lanny Griffith, and Bob Wood, regarding the Kemper Project. *See* Def.'s Mot., Attach. 4, at 13–17 (Ex. B). Defendant has submitted a declaration explaining that staff at the Office of Fossil Energy "conducted an automated search of their e-mail accounts" by searching for "'Kemper'; 'Kemper and Relocate'; [']BGR'; 'Barbour'; 'Rogers'; 'Griffith'; and 'Wood'" and "an automated search of the executive correspondence records" by searching for "'@bgrdc.com'; 'BGR'; 'Kemper'; and 'Mississippi.'" Morris Decl. ¶ 18. That declaration, in specific and clear terms, establishes that Defendant employed appropriate search terms. It reflects that Defendant selected search terms reasonably calculated to capture records responsive to Plaintiff's FOIA Request by searching for (1) the name of the power plant, (2) the name of the power plant in conjunction with its site relocation, (3) the name of the consulting group that purportedly met with government officials concerning the plant's relocation, and (4) the individual names of four members of the consulting

group.  In proffering that declaration, Defendant has met its burden; second-guessing what other terms the agency could have used would be inappropriate.  *See Bigwood*, 132 F. Supp. 3d at 140.

It remains unclear, however, whether Defendant was required to search the Office of the Secretary in order to perform an adequate search.  First, the declarations Defendant submitted do not support its contention that performing a separate search of the Office of the Secretary would be duplicative of its prior searches.  Although Defendant cites Mr. Morris' declaration to support its statement that the Office of Fossil Energy searched the Office of the Executive Secretariat (which would have reached responsive records in the Office of the Secretary), Mr. Morris' declaration itself references neither the Office of the Executive Secretariat nor the Office of the Secretary.  *See* Def.'s Opp'n at 13 (citing Morris Decl. ¶ 18).  And, while Ms. Dunlap's declaration mentions that Defendant produced documents prepared *for* the Secretary of Energy, it does not reference an "Office of the Executive Secretariat," let alone explain how searching that office would produce documents contained in the Office of the Secretary.  *See* Dunlap Decl. ¶ 32 (cited in Def.'s Opp'n at 13).  Indeed, Ms. Dunlap's declaration indicates that responsive materials involving the Office of the Secretary exist, which means additional responsive records could exist, as well.  *See id.* (explaining that NETL produced documents "involv[ing] the Office of the Secretary").  Thus, after locating responsive records involving the Office of the Secretary, Defendant needed either to search that Office or explain in a detailed affidavit or declaration why such a search would have been fruitless or redundant.  *Cf. Aguiar*, 865 F.3d at 738–39 (explaining that, for summary judgment to be appropriate, an agency's affidavit must describe not only the search the agency undertook, but also why the only reasonable place to look for responsive materials was the place searched); *Coleman v. DEA*, 134 F. Supp. 3d 294, 301 (D.D.C. 2015) (explaining that an agency is not free to ignore "*clear leads* that may indicate other offices that

should have been searched" (alterations adopted) (internal quotation marks omitted)). Defendant

did not do either. Accordingly, there remains a material issue of fact as to whether Defendant

performed an adequate search without separately searching the Office of the Secretary.

Given that a material issue of fact remains as to the adequacy of Defendant's search, an

entry of summary judgment is not warranted for either party. The court will permit Defendant to

supplement the record and renew its motion on this issue. When doing so, Defendant either can

conduct a search of the Office of Secretary for responsive material or submit facts explaining

(1) the organizational and record-keeping relationships, if any, among the Office of the Executive

Secretariat, Office of the Secretary, NETL, and Office of Fossil Energy; and (2) why NETL's and

the Office of Fossil Energy's searches would have reached all responsive records maintained by

the Office of the Secretary, such that a separate search is unnecessary.

### B. Exemption 4

Next, Plaintiff argues that Defendant inappropriately relied on FOIA Exemption 4 to

withhold information about the breakdown of costs associated with construction of the power plant

and related materials. Specifically, Plaintiff disputes Defendant's decision to redact portions of

the "Cooperative Agreement Amendments"; "Cooperative Agreement Modifications and

Amendments"; "Site Change Plan, emails and correspondence Negotiation Memorandum,

Repayment Agreement, and Selection Statement"; "Southern Company's Application, Project

Narrative, Host Site Agreement, Letters of Commitment, Partners and subcontracts' names and

information"; "Southern Company's application, repayment plan, selection statement,

modifications to cooperative agreement"; and "Exhibits on cost participation and project

analyses." *See* Pl.'s Mem. at 15; Def.'s Mot., Attach. 5, ECF No. 13-5 [hereinafter NETL *Vaughn*

Index], at 1–4, 6, 8; Def.'s Mot., Attach. 6, ECF No. 15-6 [hereinafter DOE HQ *Vaughn* Index],

at 8 (No. 13, Attach.).   According to the *Vaughn* Indices, Defendant redacted from these materials "the breakdown of costs[,] including cost sharing, labor and overhead along with subcontract information"; "the names of the negotiators in the financial assistance negotiation memorandum along with the Selection Statement containing the names and evaluations of negotiators involved in the selection of Southern Company"; "portions of the Project Narrative submitted as a part of Southern Company's application . . . describing the specific technology and proprietary business methods proposed to complete the project . . . . [and] [t]he names of business partners and subcontractors participating in the project"; "cost information submitted in the application and modifications of the cooperative agreement"; and "exhibits of . . . proprietary technical, cost, and other financial information that was compiled by Southern [Company] and is not available in the public domain."   *See* NETL *Vaughn* Index at 1–4, 6, 8; DOE HQ *Vaughn* Index at 8 (No. 13, Attach.).

Under Exemption 4, the Government need not disclose "trade secrets and commercial or financial information obtained from a person and privileged or confidential."   5 U.S.C. § 552(b)(4).   The exemption demands three showings: the information must (1) have been "obtained from a person," (2) consist of "trade secrets or commercial or financial information," and (3) be "privileged or confidential" in nature.   *See Wash. Post. Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C. Cir. 1982); *Ctr. for Digital Democracy v. FTC*, 189 F. Supp. 3d 151, 159 (D.D.C. 2016).   The D.C. Circuit has developed two tests to determine whether information is "confidential" and instructed that, in deciding between the two tests, the central inquiry is the manner in which the agency obtained the information.   *See Ctr. for Digital Democracy*, 189 F. Supp. 3d at 159.   When the agency receives the information at issue as part of a mandatory disclosure—as the parties agree is the case here—the agency must demonstrate that

disclosing the information "is likely '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Wash. Post. Co.*, 690 F.2d at 268 (quoting *Nat'l Parks & Conserv. Ass'n v. Morton*, 498 F. 2d 765, 770 (D.C. Cir. 1974)).

The question before the court in this case is limited. The parties agree that Southern Company is a "person" within the meaning of the statute, the withheld information is "commercial or financial information," and Southern Company mandatorily disclosed that information as a condition of receiving federal funding—they dispute only whether the information is "confidential." *See* Pl.'s Mem. at 15 & n.3; Def.'s Opp'n at 2; *cf.* Dunlap Decl. ¶¶ 42–43. Consequently, the court need only determine whether Defendant has met its burden of demonstrating that disclosure of the withheld materials would either (1) impair Defendant's ability to obtain the information in the future, or (2) cause substantial harm to Southern Company's competitive position.

Because Defendant invokes both prongs of the mandatory-disclosure test to justify its withholdings in this case, the court evaluates each, in turn.

### 1. *The Government's Ability to Gather Information in the Future*

To determine whether disclosure of withheld materials could impair the Government's ability to obtain that type of information in the future, the court must engage in a "rough balancing of the extent of impairment and the importance of the information against the public interest in disclosure." *See Wash. Post. Co.*, 690 F.2d at 269. The Government's ability to mandate disclosure in the future is only one aspect of the calculus; the court must also consider whether "suppliers of information, as a consequence of public disclosure, will narrowly construe the government's requests and thereby seriously impair the government's information-gathering

ability." *Ctr. for Digital Democracy*, 189 F. Supp. 3d at 160. If the court determines the

Government could be disadvantaged as a result of disclosing the supplier's information, then the

court must assess "whether this risk outweigh[s] the public's interest in disclosure." *Wash. Post*

*Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 324–25 (D.C. Cir. 1989).

Defendant argues that disclosing the information presently withheld will cause private

entities to provide lower quality information in the future, thereby impairing its information-

gathering ability. *See* Def.'s Opp'n at 7–8. For support, Defendant points to a statement from

Southern Company that disclosure in this case would negatively affect its future relationship with

Defendant. *See id.* at 8. Specifically, Southern Company submits that

> [Defendant] has a significant interest in maintaining the trust of its
> partners in the energy industry by appropriately safeguarding their
> confidential business information from public disclosure,
> particularly where, as here, the [withheld materials] relate[] to an
> advanced energy production facility. Were [Defendant] to publicly
> disclose the [withheld materials], and thereby reveal the fruits of
> [Southern] Company's substantial investments of time, resources,
> and expertise, [Southern] Company would certainly be less inclined
> to provide [Defendant] with the same type, quantity, and quality of
> information . . . in the future. Furthermore, [Southern] Company
> believes there is a substantial likelihood that public disclosure of . .
> . [the withheld materials] could negatively impact [Defendant]'s
> prospects of partnering with other companies in the energy industry
> on the development of advanced technologies and facilities in the
> future.

Def.'s Opp'n, Attach. 2, ECF No. 18-2, at 20–34 [hereinafter Suppl. Dunlap Decl., Ex. C], at 14

(citation omitted). Southern Company's statement primarily expresses the general private interest

in preventing disclosure—keeping behind closed doors industry knowledge and operational

information that a company has spent significant time, energy, and resources cultivating.

Southern Company's statement, however, does not sufficiently show that disclosing the

information at issue would likely impair Defendant's ability to collect such information in the

future.  In the context of mandatory disclosures, "the 'continued reliability' or 'quality' of the information obtained by the government is assumed because companies required to submit information would risk losing the government benefit for failing to comply fully and completely." *Ctr. for Auto Safety v. U.S. Dep't of the Treasury*, 133 F. Supp. 3d 109, 128 (D.D.C. 2015) (citation omitted).  Southern Company's statement does not rebut that presumption.  Indeed, all Southern Company has said is that public disclosure of the presently withheld information would make the company "less inclined" to provide Defendant with information of the same "type, quantity, and quality."  Suppl. Dunlap Decl., Ex. C, at 14.  It is not clear, however, whether Southern Company would have the freedom to minimize the quantity or quality of information it supplies to Defendant and still obtain federal funding for an initiative like the Kemper Project, given that disclosure of the very information at issue appears to be a condition of receiving federal funding.  A single, conclusory statement from Southern Company simply does not address that critical question.  *Cf. Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999) (holding that the Government had not carried its burden when it offered only two conclusory affidavits, one of which was the "speculative opinion" of a Government affiant "that [private entities] may not be forthcoming in the data they submit if [the agency] allows disclosure" and the other a "terse and self-serving statement" from a private secular executive that "he would 'attempt to minimize the scope and specificity of the information provided'" were the Government to disclose the withheld information); *Ctr. for Auto Safety*, 133 F. Supp. 3d at 128.  On this thin record, the court is unable to determine whether disclosure actually presents a likelihood of impairing Defendant's future ability to obtain this type of information from Southern Company or other private entities seeking federal funding and, correlatively, whether that risk outweighs the public interest in disclosure.

Accordingly, an entry of summary judgment based on this theory is not possible.

*Substantial Harm to Southern Company's Competitive Position*

To determine whether disclosure of withheld materials could substantially harm a private entity's competitive position, the Government must demonstrate that the private entity "(1) actually face[s] competition, and (2) substantial competitive injury would likely result from disclosure." *Niagara Mohawk Power Corp.*, 169 F.3d at 18 (internal quotation marks omitted). These showings must be concrete, not conjectural; hypothetical or future competition is not enough, and the competitive injury cannot be too remote or conditioned on occasional renegotiation of a long-term contract. *Id.* at 18–19.

Here, Defendant relies entirely on two statements from Griff Waters, Managing Attorney at Southern Company, to support its position that disclosing the presently withheld information would cause Southern Company substantial competitive harm. The first statement explains that disclosure of the redacted information concerning the Kemper Project would put Southern Company at a competitive disadvantage in light of the novelty of the information being shared:

> [T]he [Kemper] Project is a first-of-a-kind power generating facility that employs new, proprietary technologies and represents the establishment of new opportunities for coal-fired generation within the global energy industry. The Project is the product of a significant investment of time, money, and resources, and relies upon the extensive experience and expertise of [Southern] Company's personnel. Thus, the [withheld information] is particularly sensitive given the novelty of the Project and the great potential value to competitors that knowledge of, or the capacity to quickly develop, systems and technologies similar to those utilized at the Project would entail. Public disclosure of this information would afford competitors or potential competitors the opportunity to obtain this valuable information without having invested these substantial resources, thereby placing [Southern] Company at a competitive disadvantage.

Def.'s Opp'n, Attach. 3, ECF No. 18-3, at 4–13 [hereinafter Suppl. Morris Decl., Ex. A], at 3–4l; *see* Def.'s Opp'n at 3–4. The second statement provides additional details of the anticipated

harm:

> Such information would not only be unduly advantageous for a competitor to access and use towards developing—or even merely evaluating the development—of its own project, but contractors, vendors, and other companies with whom [Southern] Company does business could leverage such inside financial information in future negotiations with [Southern] Company, thereby weakening [Southern] Company's competitive position.

Suppl. Dunlap Decl., Ex. C, at 8; *see* Def.'s Opp'n at 5. In combination, the statements reflect Southern Company's belief that disclosure would reveal propriety information that might be used to its detriment.

These statements are not enough to satisfy Defendant's burden of putting forth reliable evidence of actual competition between Southern Company and any other company. The statements describe the withheld information as being of "great potential value *to competitors*"; public disclosure of the information "would afford *competitors or potential competitors* the opportunity to obtain this valuable information"; and "contractors, vendors, and *other companies with whom [Southern] Company does business* could leverage such inside information in future negotiations." *See* Suppl. Morris Decl., Ex. A, at 3–4 (emphases added); Suppl. Dunlap Decl., Ex. C, at 8 (emphasis added). These generalized statements are insufficient. At no point does Mr. Waters describe the market in which Southern Company faces competition or against whom Southern Company actually competes in its use of such technology. It is also unclear to the court whether other entities sought federal funding for the development of clean coal technology or might compete with Southern Company for such funding in the future. Moreover, to the extent Southern Company claims disclosure would weaken its competitive position with regard to cost inputs, Mr. Waters likewise describes that form of "actual competition" in conclusory terms. He does not, for instance, describe how, if at all, Southern Company uses competition among potential

contractors and vendors to manage operating costs or capital expenses. Thus, while the proffered statements support the contention that Southern Company *might* have competitors or *may* make use of competitive bidding, they do not reflect the *actual* competition required under the case law. *Cf. Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 130 F. Supp. 3d 1, 10 (D.D.C. 2015). In other words, based on the present record, the competition Defendant cites is wholly hypothetical.

Defendant could have demonstrated that Southern Company faces actual competition in a number of ways. It could have submitted an affidavit that lists Southern Company's competitors. *See, e.g.*, *Gov't Accountability Project v. FDA*, 206 F. Supp. 3d 420, 438 (D.D.C. 2016); *Ctr. for Digital Democracy*, 189 F. Supp. 3d at 164. Defendant also could have submitted affidavits, expert reports, or deposition testimony—reliable evidence—identifying the number of competitors in the industry or describing the number of private entities vying for federal funding to develop similar initiatives. *Cf. Ctr. for the Study of Servs.*, 130 F. Supp. 3d at 10. Conclusory statements from Southern Company that describe its own competition in generalized and hypothetical terms, however, will not suffice.

Accordingly, an entry of summary judgment based on this theory is not possible, either.

**C. Exemption 5**

Plaintiff also challenges Defendant's reliance on FOIA Exemption 5 to withhold e-mail discussions between and among agency employees, as well as requests for legal advice and the responses to those requests. In particular, Plaintiff contests ten entries in the DOE Headquarters *Vaughn* Index: Nos. 3, 7, 8, 9, 10, 11, 12, 14, 15, and 16. Pl.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 20 [hereinafter Pl.'s Reply], at 6. With citation to Mr. Morris' and Ms. Dunlap's declarations, Defendant submits that it properly invoked Exemption 5 to withhold that

information because the deliberative process privilege protects all the documents Plaintiff lists and the attorney-client privilege also protects four of those documents. *See* Def.'s Mot., Mem. in Supp., ECF No. 13-2 [hereinafter Def.'s Mem.], at 9–11. Plaintiff asserts that Defendant has not put forward sufficient information to support its claim that the withheld materials are privileged. In particular, Plaintiff argues that Defendant cannot rely on the declaration of either Ms. Dunlap or Mr. Morris because neither declarant had personal knowledge of the facts asserted. Pl.'s Mem. at 9–12. Additionally, Plaintiff challenges Ms. Dunlap's declaration as inappropriately "qualified" because it uses the word "affirm," contrary to the United States Code's requirements for a sworn statement. *Id.* at 11.

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 5552(b)(5). As a general matter, an agency may invoke Exemption 5 to withhold materials that would be protected from discovery in ordinary civil litigation under a "recognized evidentiary or discovery privilege." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (alteration adopted) (internal quotation marks omitted). The attorney-client and deliberative process privileges are among those privileges recognized in everyday litigation and, correlatively, are ones upon which an agency can rely when invoking Exemption 5. *Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016). To rely on the deliberative process privilege, the Government must show that the material it redacted was both "predecisional" and "deliberative." *See Judicial Watch, Inc.*, 847 F.3d at 739. "Documents are 'predecisional' if they are generated before the adoption of an agency policy, and 'deliberative' if they reflect the give-and-take of the consultative process." *Id.* (alteration adopted) (internal quotation marks omitted). For purposes

of FOIA Exemption 5, the attorney-client privilege shields "confidential communication from an attorney to a[n agency-]client, but only if that communication is based on confidential information provided by the [agency-]client." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977). Not all conversations between an agency and its attorneys are privileged. To properly invoke Exemption 5 based on this privilege, the agency must demonstrate that the withheld material "(1) involves confidential communications between an attorney and his or her client and (2) relates to a legal matter for which the client has sought professional advice." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, No. 16-360, 2017 WL 1166322, at *7 (D.D.C. Mar. 28, 2017) (alteration adopted) (internal quotation marks omitted).

As a preliminary matter, the court dismisses Plaintiff's suggestion that Ms. Dunlap's declaration falls short of a "sworn statement" simply because Ms. Dunlap used the word "affirm." Section 1746 of Title 28 of the United States Code requires that sworn statements executed in the United States and intended to be used as evidence contain a line "in substantially the following form: . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).'" 28 U.S.C. § 1746(2). Ms. Dunlap's declaration concludes with the following line: "Pursuant to 28 U.S.C. § 1746, I hereby *affirm* under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief." Dunlap Decl. ¶ 53 (signed and dated October 4, 2016) (emphasis added). Plaintiff cites nothing to support its proposition that the word "affirm" is not "substantially" similar to "declare (or certify, verify, or state)." On the contrary, Black's Law Dictionary describes the word "affirm" as an alternate to the word "swear" when making a statement under oath. *See Affirm*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("To solemnly declare rather than swear under oath."); *cf. Affirmation*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/affirmation ("[A]

solemn declaration made under the penalties of perjury by a person who conscientiously declines taking an oath."). Accordingly, the court concludes that using the word "affirm" satisfies the requirements of Section 1746.

The court also rejects Plaintiff's assertion that Defendant's declarants lacked personal knowledge of the facts they asserted in their declarations. Rule 56 of the Federal Rules of Civil Procedure requires that "[a]n affidavit or declaration used to support or oppose a motion . . . be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A FOIA declarant "satisfies the personal knowledge requirement in Rule 56[(c)(4)] if in his declaration, he attests to his personal knowledge of the procedures used in handling a FOIA request and his familiarity with the documents in question." *Barnard v. U.S. Dep't Homeland Sec.*, 531 F. Supp. 2d 131, 138 (D.D.C. 2008).[2] The D.C. Circuit has explained that, in this context, the person who coordinates and oversees the search for documents responsive to the FOIA Request is "the most appropriate person to provide a comprehensive affidavit," even if that affiant relies on "partly second-hand" information. *SafeCard Servs., Inc.*, 926 F.2d at 1201. Contrary to Plaintiff's contention, Ms. Dunlap and Mr. Morris are the most appropriate individuals to provide declarations concerning the searches undertaken and exemptions asserted in this matter, and their declarations demonstrate they had personal knowledge of the issues at hand. First, Plaintiff cites no authority for the proposition that Defendant needed to submit declarations from "a senior executive or high ranking policy official at the agency" in order to justify its withholdings. Indeed, Circuit precedent contradicts that proposition—the individual who coordinates and

---

[2] Rule 56 was amended in 2010, at which time the personal knowledge requirement for affidavits and declarations filed in support of a motion was relocated to subsection (c)(4). *See* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendments.

oversees a search in response to a FOIA Request is the individual most appropriate to give a declaration. *See SafeCard Servs., Inc.*, 926 F.2d at 1201. Second, both declarations satisfy Rule 56(c)(4) because Ms. Dunlap and Mr. Morris each attest to their respective roles as NETL's FOIA Officer and DOE Headquarters' FOIA Officer, personal knowledge of the procedures that NETL and/or DOE Headquarters follow when responding to FOIA requests, supervision of the search undertaken in response to Plaintiff's FOIA Request, and general familiarity with the documents at issue. *See* Dunlap Decl. ¶¶ 1–5, 8–9, 15; Morris Decl. ¶¶ 1–6, 11, 23; *see also Barnard*, 531 F. Supp. 2d at 138. Neither declarant was obligated to perform the search him- or herself. *See Carter, Fullerton & Hayes LLC v. FTC*, 520 F. Supp. 2d 134, 146 (D.D.C 2007). The court therefore concludes the declarations satisfy Rule 56(c)(4)'s personal knowledge requirement.

The court finds, however, that Defendant has not carried its burden of proving either privilege applies to the documents in question. Indeed, material issues of fact remain as to Defendant's invocation of both the deliberative process privilege and attorney-client privilege.

Defendant cannot successfully claim the documents fall within the deliberative process privilege because Defendant has not shown that any withheld document actually predates an agency decision. In fact, not one entry in the DOE Headquarters *Vaughn* Index identifies any "decision" to which the withheld material contributed. The Index describes Document 3 as an "email chain discussing draft talking points for a meeting on the Kemper project." *See* DOE HQ *Vaughn* Index at 1 (No. 3). Documents 9, 10, and 11 are labeled "email chain discussing a proposal regarding the Mississippi coal plant," which the court assumes refers to the Kemper Project. *See id.* at 4–7 (Nos. 9, 10, 11). Documents 7, 8, and 12 are similarly described as e-mail chains in preparation for a meeting, but do not even identify the topic of the meeting. *See id.* at 2–3, 7 (Nos. 7, 8, 12). Lastly, the Index generically describes Documents 14, 15, and 16

each as "email chain discussing talking points for phone call." *Id.* at 9–13 (Nos. 14, 15, 16). These descriptions provide no indication whether the redacted material was "generated before the adoption of an agency policy," *see Judicial Watch, Inc.*, 847 F.3d at 739, because "a proposal," "a meeting," and "a phone call" are not agency decisions. The declarations to which Defendant points provide no further support. Neither Ms. Dunlap nor Mr. Morris identifies a single agency action to which the withheld materials contributed. *See* Dunlap Decl. ¶¶ 45–48; Morris Decl. ¶¶ 28–30. At most, Ms. Dunlap vaguely indicates that some of the materials pertain to "a draft permit application and the request to relocate the project," but provides no further details. *See* Dunlap Decl. ¶ 49. Thus, Defendant does not put forward sufficient information to allow the court to determine whether the deliberative process privilege applies.

Defendant's reliance on the attorney-client privilege also comes up short because it is unclear whether the four documents Defendant seeks to withhold reflect confidential communications related to a matter for which Defendant sought legal advice. Defendant's descriptions of those four documents—entries 10, 11, 15, and 16 of the DOE Headquarters *Vaughn* Index—provide no indication that they involve privileged communications between the agency and its attorney, as they are merely described as "email chain discussing a proposal regarding the Mississippi coal plant," DOE HQ *Vaughn* Index at 5–6 (Nos. 10, 11), and "email chain discussing talking points for phone call," *id.* at 10–11 (Nos. 15, 16). Those communications could very well concern business matters, which is not protected by the attorney-client privilege. *See Ctr. for Public Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65, 77 (D.D.C. 2017). Additionally, the "justification" Defendant provided is practically identical in all four entries, stating only that a portion of the e-mail chain "contains communications between DOE staff and a DOE attorney" in which "legal advice [is] provided by the DOE attorney" and release of that information "would

deprive DOE staff of the benefit of confidential advice from DOE attorneys in legal matters related to policy decisions." DOE HQ *Vaughn* Index at 5–6, 10–13 (Nos. 10, 11, 15, 16). Defendant's declarants put no more meat on the bones of the Index. Ms. Dunlap only states that "[t]he withheld information consists of legal advice sought by NETL staff from the Office of Chief Counsel at NETL and the Office of the General Counsel at DOE headquarters, and the legal advice provided in response to those requests." Dunlap Decl. ¶ 48. Similarly, Mr. Morris states that "[t]he withheld information consists of requests for legal advice sought by DOE program staff from GC and legal advice provided by GC regarding draft documents and statements." Morris Decl. ¶ 31. Merely claiming that a communication is "legal advice" is not enough for the court to assess whether the communication actually was a confidential communication and related to a matter for which *the agency* would seek advice about a legal matter. *Cf.* Fed. R. Civ. P. 26(b)(5)(A) (requiring a party asserting a privilege to "describe the nature" of the withheld material and "do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim"); *see also* Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment (stating that "[d]etails concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld"). As another court in this District recently observed, "the attorney-client privilege is not an all-purpose FOIA evasion mechanism," *Public Emps. for Envtl. Responsibility v. EPA*, 211 F. Supp. 3d 227, 231 (D.D.C. 2016), and this court will not allow Defendant to treat it as one by rubberstamping the boilerplate language in the proffered declarations and DOE Headquarters *Vaughn* Index as sufficient. Accordingly, the court concludes a material issue of fact remains as to whether these four documents fall within the attorney-client privilege for purposes of Exemption 5.

For the reasons stated, summary judgment is not warranted for either party with regard to Defendant's reliance on Exemption 5.   If Defendant wishes to supplement the record and renew its motion for summary judgment, then it must submit at least one reasonably detailed affidavit explaining (1) the agency decision to which each withheld document purportedly contributed; (2) why those materials are "deliberative" in nature, as that term is understood in this Circuit[3]; (3) whether the communications between agency staff and counsel were confidential; and (4) the general nature or topic of the "legal advice" the agency sought from its counsel.

### D.    Exemption 6

Lastly, Plaintiff challenges seven entries in the NETL *Vaughn* Index and nine entries in the DOE Headquarters *Vaughn* Index as inappropriately withheld pursuant to FOIA Exemption 6. *See* Pl.'s Mem. at 12, 24 (challenging NETL *Vaughn* Index at 5, 10, 12, and 13; DOE HQ *Vaughn* Index Nos. 3, 7, 8–12, 15–16).   Defendant asserts that it need not disclose the "names, telephone numbers, email addresses, and home addresses" of Southern Company employees who worked on or assisted with the Kemper Project because those individuals' privacy interests outweigh any public interest in disclosing their identities.   Def.'s Mem. at 13.   More importantly, Defendant argues, this issue is now moot, as Plaintiff's own declarant states that the very names Plaintiff seeks are publicly available through Southern Company's Securities and Exchange Commission filings.   Def.'s Reply in Supp. of Summ. J. & Opp'n to Pl.'s Cross-Mot., ECF No. 19, at 12–13 (referencing Zegart Decl. ¶ 15).   Plaintiff does not dispute that the personal contact information of Southern Company employees is protected under Exemption 6.   Pl.'s Mem. at 24–25.

---

[3] The court need not address whether the materials Defendant seeks to withhold qualify as "deliberative" because it is plain from the record that Defendant has not shown they are "predecisional."   The court notes, however, that boilerplate language in the *Vaughn* Index or a declaration will no more support a finding that a document is "deliberative" than a finding that it is "predecisional."   In supplementing the record, Defendant should be cognizant that it bears the burden of establishing both characteristics if it wishes to withhold a document based on the deliberative process privilege.

It submits, however, that Defendant's declarations are insufficient to justify withholding the names of those employees because they are generic and fail to identify a cognizable privacy interest implicated by disclosure, while the public has a substantial interest in learning the "identities of business persons responsible for the administration . . . of government funds." Pl.'s Mot. at 13, 24–25. Additionally, Plaintiff believes its ability to obtain the information from the Securities and Exchange Commission does not moot the issue, but rather, supports its contention that Defendant's redactions were arbitrary. *See* Pl.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 20 [hereinafter Pl.'s Reply], at 7.

FOIA Exemption 6 permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 522(b)(6). To determine whether a withholding is proper, the reviewing court asks whether the information involves "personnel, medical, or 'similar' files," *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008), and, if so, then determines "whether their disclosure 'would constitute a clearly unwarranted invasion of personal privacy,'" *id.* (quoting 5 U.S.C. § 522(b)(6)). There is no need for the court to engage in this analysis, however, if the withheld materials are publicly available through another source. In that circumstance, the issue becomes moot. *See Bayala v. Dep't of Homeland Sec.*, 827 F.3d 31, 34 (D.C. Cir. 2016) (explaining that if the Government has released a portion of the requested materials, the case is moot as to those materials); *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011); *Powell v. IRS*, No. 16-1682, 2017 WL 2533348, at *9 (D.D.C. Jun. 9, 2017) (finding that, in a FOIA case, "where the government has released certain requested documents, the case is moot as to them").

As the information that Plaintiff seeks—the names of responsible Southern Company

employees—is publicly available in Southern Company's Securities and Exchange Commission filings, any dispute concerning Defendant's reliance on Exemption 6 to withhold that same material is moot. Plaintiff's own declarant—Mr. Zegart—states in his declaration that "names and other information redacted in DOE documents submitted to CIC were publicly disclosed in versions of the same documents publicly filed with the Securities and Exchange Commission." Zegart Decl. ¶ 15. Although Mr. Zegart made this statement to suggest that Defendant's redactions are "arbitrary" and unsupported by Exemption 6, his statement has the effect of mooting the dispute because it makes clear Plaintiff already has access to the same information that it requests from Defendant. *See Williams & Connolly*, 662 F.3d at 1243. As such, there is no issue for the court to resolve here.

Accordingly, the court denies as moot both motions for summary judgment as to Defendant's withholding of information under Exemption 6.

## IV.    CONCLUSION AND ORDER

In light of the foregoing, the court denies both Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment. The court denies summary judgment for Defendant as to the applicability of Exemption 4, denies summary judgment for both parties as to the adequacy of Defendant's search for responsive materials and the appropriateness of Defendant's withholdings pursuant to Exemption 5, and denies as moot any challenge pertaining to Exemption 6.

If Defendant intends to renew its Motion for Summary Judgment based on supplementary affidavits or other evidence, then the parties shall meet and confer and propose a briefing schedule by no later than October 2, 2017.


Dated: September 11, 2017

Amit P. Mehta
United States District Judge

# APPENDIX

Plaintiff seeks materials from "the period January 1, 1998[,] through and including December 31, 2011," that meet any of the following descriptions:

(1) All documents and records of communications and memoranda of any kind, including but not limited to electronic communications, regarding contacts or meetings between the National Energy Technology Laboratory and the Southern Company. You may limit your search to those documents addressing the development, funding, construction and/or implementation of so called "clean coal" technology and carbon capture and storage (CCS) technologies and the TRIG process.

(2) All documents and records of communications of any kind, including but not limited to electronic communications, regarding contacts or meetings between the National Energy Technology Laboratory and any subsidiaries, successors, or assigns of the Southern Company, including, without limitation, Mississippi Power Company, Alabama Power Company, and the Gulf Power Company. You may limit your search to those documents addressing the development, funding, construction and/or implementation of so called "clean coal" technology and carbon capture and storage (CCS) technologies and the TRIG process.

(3) All documents and records of communications of any kind, including but not limited to electronic communications, regarding CCS technologies researched or developed at the Power Systems Development Facility near Wilsonville, Alabama.

(4) All documents and records of communications and memoranda of any kind related to the decision to attempt to site a coal-fired power plant using TRIG technology in Florida.

(5) All documents and records of communications and memoranda of any kind related to the decision to site a coal-fired power plant in Kemper County, Mississippi.

(6) All documents and records of communications and memoranda of any kind related to the Kemper County facility and the BGR Group, including any of the principals of the BGR Group, including specifically but not limited to Haley Barbour, Ed Rogers, Lanny Griffith, and Bob Wood.

Def.'s Mot., Attach. 4, at 13–17 (Ex. B).