# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**CLIMATE INVESTIGATIONS CENTER,**      )
                                        )
    **Plaintiff,**  )
                                        )
    **v.**          )    **Case No. 16-cv-00124 (APM)**
                                        )
**UNITED STATES DEPARTMENT**            )
**OF ENERGY,**                          )
                                        )
    **Defendant.** )
_____ )

## MEMORANDUM OPINION AND ORDER

This is the second time that this Freedom of Information Act dispute has come before the court. At issue is Defendant U.S. Department of Energy's response to Plaintiff Climate Investigations Center's request for records concerning the funding and development of a clean-coal technology power plant in Mississippi, known as the "Kemper Project." Dissatisfied with Defendant's response, both with respect to the search conducted and the withholdings of portions of responsive records, Plaintiff filed suit in this court, challenging both.

The court previously denied the parties' cross-motions for summary judgment, concluding that there remained material issues of fact concerning the adequacy of Defendant's search and the appropriateness of its withholdings under two statutory exemptions. In addition, the court found that Plaintiff's challenge to Defendant's withholdings pursuant to a third statutory exemption was moot.

After preparing supplemental affidavits, Defendant filed a renewed motion for summary judgment. Plaintiff then filed a new cross-motion for partial summary judgment. For the reasons that follow, the court grants in part and denies in part the parties' motions. Additionally, the court

now concludes that Defendant's withholding of names on personal privacy grounds, pursuant to Exemption 6, is moot only in part and denies summary judgment as to those disputed withholdings.

I.      **BACKGROUND**

A.      **Factual Background**

Because the relevant facts are set forth in detail in an earlier opinion, *see generally* Mem. Op. & Order, ECF No. 21 [hereinafter Mem. Op.], the court only summarizes them here.  Plaintiff Climate Investigations Center submitted a Freedom of Information ("FOIA") request to Defendant Department of Energy in early 2015, seeking information concerning the implementation of certain clean-coal technology at a Mississippi power plant, known as the "Kemper Project."  *Id.* at 2. Southern Company and its wholly-owned subsidiary, Mississippi Power Company, are partially responsible for the Kemper Project's development.  *Id.*  Southern Company received a $300 million award from Defendant for the development.  *See id.*

Plaintiff directed its FOIA request to Defendant's subcomponent, the National Energy Technology Laboratory ("NETL"), which oversees the Kemper Project.  *Id.*  The request asked for all communications related to the "development, funding and/or construction and implementation of 'clean coal' technology" at the Kemper Project, including information regarding the technology developed for use at the plant and the decision to build the plant in Kemper County, Mississippi. *Id.*  NETL began to search for responsive documents after receiving the FOIA request, *id.*, but Plaintiff later refined its request to identify six categories of documents from the period beginning January 1, 1998, through December 31, 2011, *id.* at 3.  NETL then contacted Defendant's Headquarters ("DOE Headquarters"), believing that it would have responsive materials.  *Id.*

In response, DOE Headquarters referred the requests to the Office of Fossil Energy, which it believed was most likely to have the desired records.  *Id.*  The Office of Fossil Energy conducted

manual and electronic searches, and then submitted the results to the Office of Information Resources, which reviewed the records, removed duplicates, and consulted with Southern Company to determine what portions of the responsive material might cause the company harm, if disclosed. *Id*. The Office of Information Resources then redacted those portions that it believed were exempt from disclosure. *Id*. In total, DOE Headquarters, through the Office of Fossil Energy, turned over 75 records to Plaintiff, some of which contained redactions. *Id*. at 3–4.

In parallel with the Office of Fossil Energy's efforts, NETL began producing responsive records. *See id*. at 4. Before doing so, however, it consulted with DOE Headquarters about records that pertained to the Office of the Secretary. It also conferred with Southern Company to ascertain how disclosing certain records might adversely affect the company. *Id*. at 4. In the end, NETL produced to Plaintiff thousands of pages, many containing redactions. *Id*.

**B.      Procedural Background**

Plaintiff filed suit in this court on January 26, 2016, *see* Compl., ECF No. 1, and amended its complaint as of right three days later, *see* Am. Compl., ECF No. 3. Plaintiff challenged all aspects of Defendant's response to its FOIA request, arguing that Defendant's search for records was inadequate and that its redactions pursuant to statutory exemptions were improper and unsupported. *See generally* Am. Compl.

Both parties moved for summary judgment. Defendant sought summary judgment as to the adequacy of its search as well as its withholdings under FOIA Exemptions 4, 5, and 6. *See generally* Def.'s First Mot. for Summ. J., ECF No. 13, Def.'s First Mem. in Supp., ECF No. 13-2. Defendant summarized its withholding of responsive material and applicable exemptions in two *Vaughn* Indices: one from the DOE Headquarters, *see* Def.'s First Mot. for Summ. J., Ex. 2, ECF No. 13-6 [hereinafter DOE Headquarters *Vaughn* Index], and one from NETL, *see* Def.'s First

Mot. for Summ. J., Ex. 1, ECF No. 13-5 [hereinafter NETL *Vaughn* Index]. Plaintiff filed a Cross-Motion for Partial Summary Judgment in which it sought judgment as to the search issue and Defendant's withholdings under Exemptions 5 and 6. *See generally* Pl.'s First Cross-Mot. for Partial Summ. J., ECF No. 15 [hereinafter Pl.'s First Cross-Mot.], Attach. 1, Pl.'s First Mem. of P. & A. in Supp., ECF No. 15-1.

The court denied both motions. *See generally* Mem. Op. The court denied summary judgment as to the adequacy of the search and the withholdings under Exemptions 4 and 5. *See* Mem. Op. at 7–24. Additionally, the court denied Plaintiff's challenge to the withholding of Southern Company officials' names under Exemption 6, finding that a filing by Southern Company's with the Securities and Exchange Commission rendered the claim moot. *Id.* at 24–26.

After marshaling supplemental evidence, Defendant filed a Renewed Motion for Summary Judgment as to all issues. *See generally* Def.'s Renewed Mot. for Summ. J., ECF No. 25 [hereinafter Def.'s Renewed Mot.]. Plaintiff filed a Cross-Motion for Partial Summary Judgment, opposing Defendant's Renewed Motion and seeking an evidentiary hearing on the withholdings under Exemptions 4 and 5. *See generally* Pl.'s Cross-Mot. for Partial Summ. J. & Opp'n to Def.'s Renewed Mot. for Summ. J., ECF No. 27 [hereinafter Pl.'s Cross-Mot.]. These motions are now ripe for consideration.

## II.    LEGAL STANDARD

On a motion for summary judgment, a court must enter judgment in favor of the moving party if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). The court must view all the evidence in the light most favorable to the nonmoving party. *See id.* at 247–49.

A defendant agency in a FOIA case is entitled to summary judgment upon demonstrating that no material facts are in dispute, that it has conducted an "adequate search," and that all located responsive records have been produced to the plaintiff or are exempt from disclosure. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833, 840 (D.C. Cir. 2001). An "adequate search" is one that is "reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency bears the burden of proving that it performed such a search, and it may rely on sworn affidavits or declarations to do so. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). The court may grant summary judgment to the agency based on this evidence if it is reasonably specific and contradicted by neither record evidence nor evidence of agency bad faith. *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 181–82 (D.D.C. 2011). Plaintiffs can rebut an agency's supporting affidavits and declarations by demonstrating, with "specific facts," that there remains a genuine issue as to whether the agency performed an adequate search for documents responsive to the plaintiff's request. *See Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

An agency also bears the burden of showing that it properly withheld materials pursuant to a statutory exemption. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.D.C. 2014). An agency "may carry its burden . . . by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and

provided sufficient information as to the applicability of an exemption to enable the adversary system to operate." *Brennan Ctr. for Justice v. Dep't of State*, 296 F. Supp. 3d 73, 80 (D.D.C. 2017). "If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'" *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff challenges four aspects of Defendant's response to its FOIA requests: (1) the adequacy of Defendant's search; (2) the withholding of privileged and confidential "commercial or financial information" under Exemption 4; (3) the withholding of claimed privileged communications under Exemption 5; and (4) the withholding of names of individuals and other personal information under Exemption 6. *See generally* Pl.'s Cross-Mot., Attach.1, Pl.'s Mem. in Supp., ECF No. 27-1 [hereinafter Pl.'s Mem.]. The court considers each of these challenges in turn.

### A. Adequacy of the Search

Plaintiff once more contests the adequacy of Defendant's search for responsive records. In the first round of summary judgment briefing, Plaintiff raised two challenges to Defendant's search: (1) that Defendant should have used different terms when searching the Office of Fossil Energy, and (2) that Defendant should have conducted a separate search of records within the Office of the Secretary, as that office likely held responsive records that would not be captured in the search of the Office of Fossil Energy. *See* Mem. Op. at 7. As to the former argument, the court concluded that Defendant had "employed appropriate search terms" because they were

"reasonably calculated to capture records responsive to Plaintiff's FOIA Request." *Id.* at 8. But as to the latter argument, the court denied summary judgment to both parties, reasoning that Defendant's declarations "[did] not support its contention that performing a separate search . . . would [have been] duplicative of its prior searches." *Id.* at 9–10. The court's determination was based, in part, on the fact that Defendant had produced documents and correspondence that originated in the Office of the Secretary, but had not explained why a search of that Office would have been "fruitless or redundant." *Id.* at 9.

The court identified two means by which Defendant could supplement the record and renew its motion concerning the records search. *Id.* at 10. The first option was for Defendant to conduct Plaintiff's desired search of the Office of the Secretary. *Id.* In the alternative, the court noted that Defendant could "submit facts explaining: (1) the organizational and record-keeping relationships, if any, among the Office of the Executive Secretariat, Office of the Secretary, NETL, and Office of Fossil Energy; and (2) why NETL's and the Office of Fossil Energy's searches would have reached all responsive records maintained by the Office of the Secretary, such that a separate search is unnecessary." *Id.*

Defendant took the latter approach, opting to supplement the record with additional facts concerning the searches already conducted and Defendant's record-keeping. *See* Def.'s Renewed Mot., Attach. 1, Def.'s Mem. of P. & A. in Supp., ECF No. 25-1 [hereinafter Def.'s Mem.], at 6–7. The agency's support comes in the form of a supplemental declaration from Alexander Morris, Defendant's FOIA Officer, who manages all open-records requests sent to DOE Headquarters. *See* Def.'s Renewed Mot., Second Suppl. Decl. of Alexander C. Morris, ECF No. 25-3 [hereinafter Suppl. Morris. Decl.], ¶¶ 1–3. In that declaration, Morris says that a separate search of the Office of the Secretary was "unnecessary and duplicative" because the search conducted by the Office of

Fossil Energy—the "conduit to the Office of the Secretary" for the Kemper Project—"captured any responsive records" within the Office of the Secretary. *Id.* ¶¶ 17, 26. Morris then proceeds to outline the two routes by which the Office of Fossil Energy[1] would have communicated with the Office of the Secretary about the Kemper Project. Those two routes are an electronic record and tracking system, which is used for formal communications, and email, which is used for informal communications. *See id.* ¶ 16.

Morris explains that, as a matter of course, the Secretary's formal correspondence relating to Fossil Energy programs are entered into the Office of Fossil Energy's own electronic records management system. The Office of the Executive Secretariat, within the Office of the Secretary, uses a system called "eDocs" to track and maintain the Office of the Secretary's formal correspondence. *Id.* ¶¶ 13–14. Specifically, the Office of the Executive Secretariat enters "Secretarial level actions and information related to [Fossil Energy] programs" into eDocs; thus, all "formal correspondence" between the Office of the Secretary and the Office of Fossil Energy is tracked within that system. *Id.* ¶ 14. The information in eDocs, in turn, is entered into the Office of Fossil Energy's internal tracking system, "CorrTrack." *Id.* ¶ 15. Additionally, correspondence predating the tracking system was manually searched. *See id.* ¶ 19. Therefore, Defendant's search of the Office of Fossil Energy's CorrTrack system and the accompanying manual search, according to Morris, would have captured the relevant, formal correspondence within the Office of the Secretary. To belt-and-suspenders the search, Morris states that Defendant also directly searched the Office of the Secretariat's eDocs system "to ensure all responsive records had been

---

[1] Morris's conclusion that the Office of Fossil Energy search was adequate rests on an understanding of Defendant's organizational structure. As is relevant here, NETL "reports to and falls under" the Office of Fossil Energy at DOE Headquarters. *Id.* ¶ 11. Additionally, records within the Office of the Secretary are maintained by the Office of the Executive Secretariat, which is located within DOE Headquarters. *Id.* ¶ 13.

captured by [the Office of Fossil Energy's] searches." *Id.* ¶ 22.  This search did not produce any "new" materials.  *Id.* ¶¶ 23–25.

The only other way by which the Office of Fossil Energy exchanges information with the Office of the Secretary is by email.  *See id.* ¶ 16.  Emails are considered "informal" correspondence, as compared to the formal correspondence logged into CorrTrack.  *See* Def.'s Mem. at 7.  The Office of Fossil Energy searched the e-mail accounts of "senior [Fossil Energy] staff" working on the Southern Company project *and* the "archived email accounts" of three Fossil Energy officials in response to Plaintiff's FOIA request.  *See* Suppl. Morris Decl. ¶¶ 18, 20.  By electronically searching the Office of Fossil Energy's CorrTrack system and e-mail accounts of senior Fossil Energy staff, Morris states, Defendant searched the "only two routes to submit information or to receive information from the Office of the Secretary." *Id.* ¶¶ 25–26; *see also id.* ¶¶ 16, 18–21.

Morris notes one more search: that of the Office of History and Heritage Resources, which is located inside the Office of the Secretariat and "maintains a database with physical records of the former Secretaries of Energy," including "reports, briefing material, and formal communications." *Id.* ¶¶ 24–25.  This search of physical records did not yield any responsive records. *Id.* ¶ 25.

Notwithstanding this new, detailed information, Plaintiff contends that Defendant's search is inadequate for two reasons.  First, Plaintiff contends that Defendant's search of the Office of Fossil Energy did not capture all correspondence on the Kemper Project between Fossil Energy and the Office of the Secretary because a search of the Office of Fossil Energy would capture only "formal" correspondence, rather than *all* correspondence, and thus would not include "short conversational 'informal' emails about any topic, including the subjects of [Plaintiff's] FOIA

request." Pl.'s Mem. at 6–7. That criticism is misplaced. As explained in Morris's Supplemental Declaration, informal communication with the Office of the Secretary would have been transmitted or received by email with senior staff within the Office of Fossil Energy. *See* Suppl. Morris Decl. ¶¶ 17–18. Defendant searched those email accounts. *See id.* ¶¶ 18, 20. To the extent Plaintiff believes that Defendant's email searches would not have captured all relevant informal correspondence, *see* Pl.'s Reply in Supp. of Cross-Mot. for Partial Summ. J., ECF No. 31 [hereinafter Pl.'s Second Reply], at 4–5, Defendant's search of the database of physical documents fills that gap.

Plaintiff further insists that Defendant's search of the Office of the Secretary was inadequate because it did not turn up certain types of records. For instance, the search returned no documents concerning the Secretary's visit to the Kemper Project or messages regarding the Project's funding as part of the Department of Energy's budget. *See id.* at 4–6 & n.3. The absence of such records does not, however, establish a deficient search. It is not at all surprising that Defendant has not produced records relating to the Secretary of Energy's visit to the Kemper Project, as that visit occurred in November 2013, two years *after* the end of the date range of Plaintiff's FOIA request. *See* Mem. Op., App. (noting that Plaintiff's FOIA request sought records from the period beginning January 1, 1998, and ending December 31, 2011); Pl.'s Second Reply, App., ECF No. 31-1, at 6–7 (noting that Department of Energy Secretary Moniz toured the Kemper Project's facility on November 8, 2013). Moreover, "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." *SafeCard Servs.*, 926 F.2d at 1201. Thus, the mere fact that "there were congressional hearings . . . on budget matters," yet no records uncovered, does not render the agency's search inadequate. *See* Pl.'s Second Reply at 5–6 & n.3; *see also* Pl.'s Mem. at 7 n.3.

Second, Plaintiff argues that Defendant's search was inadequate because it did not include two other locations: the Office of General Counsel and the Office of Congressional and Intergovernmental Affairs. *See* Pl.'s Mem. at 7; Pl.'s Second Reply at 5. Plaintiff has not, however, "established a sufficient predicate to justify searching" these locations. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). As to the Office of General Counsel, Defendant's *Vaughn* indices do not show the Office's involvement in the Kemper Project, except in one instance. *See* Def.'s First Mot. for Summ. J., Decl. of Ann C. Dunlap, ECF No. 13-3 [hereinafter Dunlap Decl.], ¶ 48 (stating that, pursuant to Exemption 5 of FOIA, NETL withheld information including "legal advice sought by NETL staff from . . . the Office of the General Counsel at DOE headquarters"). The clear majority of references to communications with government counsel are with *NETL*'s counsel, not the Office of General Counsel at DOE Headquarters. A one-time reference to the Office of General Counsel, without a more substantial factual predicate, does not merit a search of that entire office. *See Campbell*, 164 F.3d at 28 (providing that an agency need not search every record system, only those that are likely to turn up responsive records). In addition, Plaintiff offers no reason to believe that Congress gave particular attention to the Kemper Project during budget meetings, such that Defendant's Office of Congressional and Intergovernmental Affairs is likely to have records. Plaintiff's conjecture alone cannot compel a search of that office.

In sum, Defendant's detailed summary of its efforts convinces the court that Defendant's search was "reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). Because Plaintiff has failed to rebut Defendant's showing with any facts that that suggest additional searches are required, the court grants Defendant's Renewed Motion for Summary Judgment as to the adequacy of its search.

## B.     Exemption 4 Withholdings

Next, the court turns to the parties' dispute concerning Defendant's withholding of commercial and financial information pursuant to Exemption 4.  *See* Def.'s Mem. at 7–13. Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  In a challenge to a withholding where the underlying records are *not* trade secrets, as is the case here, "the agency must establish that the withheld records are (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  *Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214, 229–30 (D.D.C. 2017) (internal quotation marks omitted).  And, where, as here, "an agency receives the sought-after information by way of a *mandatory* disclosure, the information is considered confidential for purposes of FOIA Exemption 4 if disclosure is likely (1) to impair the agency's ability to obtain the information in the future or (2) to cause substantial harm to the competitive position of the source of the information."  *Ctr. for Dig. Democracy v. FTC*, 189 F. Supp. 3d 151, 159 (D.D.C. 2016) (citing *Nat'l Parks Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)); *accord People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Human Servs.*, No. 16-5269, 2018 WL 4000478, at *3 (D.C. Cir. Aug. 17, 2018); *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 268 (D.C. Cir. 1982).  "[I]nformation is confidential only if disclosure would either impair the government's ability to obtain the necessary information in the future or cause substantial harm to the competitive position of the person from whom the information was obtained."  *People for the Ethical Treatment of Animals*, 2018 WL 4000478, at *3 (internal quotation marks and citation omitted); *accord Wash. Post Co.*, 690 F.2d at 268 (D.C. Cir. 1982).

Both NETL and DOE Headquarters cited Exemption 4 as the basis for their withholdings of records concerning the cost of the Kemper Project, as well as Southern Company's technology and business methods. *See* Mem. Op. at 10–11. Defendant's first motion for summary judgment faltered on the confidentiality showing because Defendant had not shown either that disclosure of the cost and business information likely would impair the government's ability to obtain information in the future, or that disclosure would damage Southern Company's competitive position. *Id.* at 12, 14, 17. As to the government-harm inquiry, the court concluded that on the "thin record" presented by Defendant, it could not conclude "whether disclosure actually presents a likelihood of impairing [Defendant's] future ability to obtain this type of information from Southern Company or other private entities seeking federal funding and, correlatively, whether that risk outweighs the public interest in disclosure." *Id.* at 14. A satisfactory showing, the court suggested, would provide information as to whether Southern Company would be able "to minimize the quantity or quality of information it supplies to Defendant and still obtain federal funding." *Id.* As to the competitive-harm prong, the court concluded that Defendant's evidence— two statements from the Managing Attorney at Southern Company—did not justify the withholding because it did not establish actual competition between Southern Company and others. *Id.* at 15–17. In denying Defendant's motion on this basis, the court identified several ways by which Defendant might establish the existence of competition, such as providing a list of rivals or submitting affidavits describing the number of private entities seeking federal funding for similar initiatives. *Id.*

In its renewed motion for summary judgment, Defendant submits new declarations aimed at establishing that disclosure would harm both the government's ability to collect information and

Southern Company's competitive position. *See* Def.'s Mem. at 10–13. Although Plaintiff challenges only the latter showing, *see* Pl.'s Mem. at 8–9, the court considers both.

### 1. Harm to Government

In evaluating an agency's claim that disclosure would impair its ability to obtain information in the future, the court conducts a "rough balancing of the extent of the impairment and the importance of the information against the public interest in disclosure." *Ctr. for Dig. Democracy*, 189 F. Supp. 3d at 160 (quoting *Wash. Post Co.*, 690 F.2d at 269). Impairment includes "the possibility that suppliers of information, as a consequence of public disclosure, will narrowly construe the government's requests and thereby seriously impair the government's information-gathering ability." *Id.* If the court determines that the government may be harmed as a result of disclosing the supplier's information, the court then proceeds to evaluate "whether this risk outweigh[s] the public's interest in disclosure." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 324–25 (D.C. Cir. 1989).

In this second round of summary judgment briefing, Defendant presents a far stronger basis for its invocation of Exemption 4. In its supplemental declaration from Ann C. Guy, NETL's FOIA Officer, Defendant sets forth why it believes that companies seeking federal funding might provide it with lower-quality information, or cease pursuing federal funding altogether, should the sensitive business information that those companies provide be made public. *See* Def.'s Mem. at 12–13; *see also* Second Suppl. Decl. of Ann C. Guy, ECF No. 25-4 [hereinafter Suppl. Guy Decl.], ¶¶ 10–20. According to Guy, "the specificity and accuracy of the information submitted" in support of applications for federal funding, including the Kemper Project, are "instrumental to a comprehensive evaluation of the proposal." *Id.* ¶ 14. Guy believes that companies that seek funding "likely understand that NETL will protect their proprietary information and other

information which, if disclosed, could negatively impact their competitiveness for future awards." *Id*. ¶ 15. Therefore, "[p]rotecting [companies' sensitive business] information from disclosure to . . . competitors is essential to ensuring that [their] proposals contain full and accurate information in the future." *Id*. ¶ 16. As Guy sees it, if the information Defendant withheld is disclosed, companies may change their behavior by scaling back the information they provide to NETL or by refraining from pursuing federal funding altogether—both of which could stymie projects that could benefit the country. *Id*. For example, disclosure of the redacted portions of the cooperative agreement and its amendments, company software, and cost information "would likely cause Southern Company, and any other companies with whom DOE may have an interest in partnering in the future, to be less willing to provide DOE with sensitive business information in the future, which ultimately would impact DOE's opportunity to partner with said companies in the future." *Id.* ¶ 13. In addition, companies competing for agency funding, Guy states, "voluntarily provide information beyond the minimum required to enhance their application and increase their likelihood for selection, understanding that NETL will not publicly disclose information provided to it when doing so" would help their competitors. *Id*. ¶ 15; *see id*. ¶ 11 (noting that Southern Company submitted to Defendant information that is "not available through public sources").

The court has no reservation concluding that Defendant has met its burden to show government harm. Defendant, through Guy's Supplemental Declaration, has set forth why disclosing Southern Company's information, in this instance, would threaten Defendant's ongoing ability to gather information from companies seeking federal funding. *See Ctr. for Auto Safety v. U.S. Dep't of Treasury*, 133 F. Supp. 3d 109, 128 (D.D.C. 2015). As Guy explains, these applicants may stop applying for federal funding altogether or scale back the information they voluntarily

include in their applications—information that goes above and beyond that required but is nevertheless useful to NETL when evaluating proposals. This is a far cry from the tepid and imprecise statement from Southern Company on which Defendant relied during the earlier round of summary judgment. *See* Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. & Opp'n to Cross-Mot. for Partial Summ. J., ECF No. 18 [hereinafter Def.'s First Reply], Attach. 2, ECF No. 18-2, Suppl. Decl. of Ann C. Dunlap, at 20–34.

As noted, Plaintiff does not challenge Defendant's contention as to government harm. Therefore, there is no genuine issue of material fact as to the harm that might flow to the government from disclosure in this instance. In light of Defendant's "detailed and unchallenged information," Defendant is entitled to summary judgment as to the records withheld under Exemption 4. *See Cavezza v. U.S. Dep't of Justice*, 113 F. Supp. 3d 271, 276 (D.D.C. 2015).

### 2. *Harm to Company's Competitive Position*

In the interest of completeness, the court turns to the alternative argument Defendant advances in support of its Exemption 4 withholdings: that disclosure would likely cause "substantial competitive harm" to the private entity, Southern Company. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999). To succeed, the government must show that the private entity: "(1) actually face[s] competition, and (2) substantial competitive injury would likely result from disclosure." *Id.*; *accord Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976). "A sophisticated economic analysis of the likely effects of disclosure is unnecessary." *People for the Ethical Treatment of Animals*, 2018 WL 4000478, at *3 (cleaned up).

Defendant supports its position with three statements from Southern Company officials and a fourth from an energy consulting company executive. *See* Def.'s Mem. at 10–11; Def.'s

Notice of Suppl. Filing of Decls., ECF No. 26 [hereinafter Def.'s Not.]. Together, the declarations present a picture of the coal gasification industry as a competitive one and, additionally, explain the key role that government regulations and contracts play in Southern Company's business. *See, e.g.*, Def.'s Not., Attach. 4, Decl. of Kerry W. Bowers, ECF No. 26-4 [hereinafter Bowers Decl.], ¶¶ 15–16; Def.'s Not., Attach. 2, Decl. of Christopher Alan Cofield, Jr., ECF No. 26-2, ¶ 16. Through its declarants, Southern Company details the sensitivity of cost information in the industry, in part because of competitive bidding processes for funding. *See, e.g.*, Def.'s Not., Attach. 1, Decl. of Bruce Long, ECF No. 26-1, ¶¶ 15–16. Relatedly, Southern Company explains that the disclosure of "technology related information" would aid competitors by allowing them to "realize what aspects of Southern Company's technology provide competitive advantages," and help competitors develop better technologies and "reverse engineer Southern Company's trade secrets and confidential designs"—the fruit of Southern Company's labor, which it produced at "significant cost." Bowers Decl. ¶ 17. These industry representatives' statements bolster Guy's assertion that the disclosure of the withheld material—including information in the cooperative agreements, amendments, and cost information—would cause "substantial competitive harm" to Southern Company. Suppl. Guy Decl. ¶¶ 11–12.

Here, too, Defendant has carried its burden of showing the appropriateness of invoking Exemption 4. The evidence proffered by Defendant fits comfortably within the D.C. Circuit's "broad definition" of "commercial" information as including records that "reveal basic commercial operations," "relate to the income-producing aspects of a business," or concern the "commercial fortunes" of the entity. *Jordan*, 273 F. Supp. 3d at 230 (quoting *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006)). Additionally, it establishes that Southern

Company "actually face[s] competition" and that disclosure would likely cause the company "substantial competitive injury" by facilitating its competitors' development of expensive technologies. *See Niagara Mohawk Power Corp.*, 169 F.3d at 18–19.

Plaintiff's arguments otherwise are unavailing. First, Plaintiff asserts that Defendant "does not appear to have performed any independent agency analysis" and, instead, has simply "pass[ed] through" information from Southern Company officials and its associate. Pl.'s Mem. at 8. But Plaintiff cites no authority requiring an agency to conduct an "independent analysis" of likely commercial harm to invoke Exemption 4. Nor would it make sense to impose such a burdensome requirement. The persons most qualified to discuss industry competition and the competitive harm that may befall a company are company officials who know the business and the industry. For the same reason, then, Plaintiff's desire for information about "what interest [the declarants] may or may not have [ ] in the outcome of the proceedings" does not move the court. *See id.* Frequently in Exemption 4 cases the declarant is an official of the private enterprise whose information is at stake. As noted, such officials often are in the best position to explain the competitive harm that would arise from disclosure. Exemption 4 does not demand testimony from an uninterested observer to justify the withholding.

Moreover, Plaintiff's objection that the declarants have not stated that they have read or are familiar with the company's records demands too much. It is sufficient for Exemption 4 that the declarant has general knowledge of the documents' contents and is in a position to know how disclosure would impact the company. *See People for the Ethical Treatment of Animals*, 2018 WL 4000478, at *2 (stating that a declaration in support of Exemption 4 must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and . . . not [be] controverted by either

contrary evidence in the record nor by evidence of agency bad faith" (internal quotation mark omitted)). The declarations in this case meet that standard.

And so, Defendant is entitled to summary judgment as to the Exemption 4 withholdings based on the competitive harm that Southern Company would likely incur if the records were disclosed. The court also denies Plaintiff's request to cross-examine Defendant's declarants, as there is no reason to suspect Defendant or Southern Company of bad faith. *See* Pl.'s Mem. at 8–9.

### C.     Exemption 5 Withholdings

The court now turns to Defendant's Exemption 5 withholding, which are premised on the deliberative process privilege, the attorney-client privilege, or both. Exemption 5 allows an agency to withhold from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Under this exemption, an agency can refuse to produce responsive records covered by a recognized evidentiary or discovery privilege. *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738–39 (D.C. Cir. 2017). Such privileges include the attorney-client privilege and the deliberative process privilege. *See Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010).

DOE Headquarters and NETL rely upon both. DOE Headquarters withheld 10 records—Nos. 3, 7, 8, 9, 10, 11, 12, 14, 15 and 16, as listed in the DOE Headquarters *Vaughn* Index—pursuant to Exemption 5. *See generally* DOE Headquarters *Vaughn* Index. Defendant contends that the deliberative process privilege applies to all 10 records and, additionally, that four withholdings—Nos. 10, 11, 15, and 16—are protected from disclosure by the attorney-client privilege. *See id.* at 6–8, 11–14. NETL cited Exemption 5 for its withholdings of eight groups of

documents.  *See generally* NETL *Vaughn* Index.  Defendant asserts that the deliberative process privilege applies to three and that the attorney-client privilege shields the remaining five.  *See id.*

Previously, the court denied both parties' motions for summary judgment as to all Exemption 5 withholdings.  Mem. Op. at 21.  As to the deliberative process privilege, the denial rested on Defendant's failure to show "that any withheld document actually predates an agency decision," as well as the lack of information concerning the agency action as to which the documents relate.  *Id.* at 21–22.  The court concluded that Defendant also had not met its burden as to the records withheld under the attorney-client privilege because Defendant had not "provide[d] [an] indication that [the withholdings] involve privileged communications between the agency and its attorney" and thus failed to exclude the possibility that portions were outside the reach of the privilege.  *Id.* at 22–23.  The court advised that Defendant may cure these deficiencies with an affidavit that explained: "(1) the agency decision to which each withheld document purportedly contributed; (2) why those materials are 'deliberative' in nature, as that term is understood in this Circuit[ ]; (3) whether the communications between agency staff and counsel were confidential; and (4) the general nature or topic of the 'legal advice' the agency sought from counsel."  *Id.* at 24 (footnote omitted).

Endeavoring to follow the court's guidance, Defendant now provides additional information regarding these records through supplemental declarations from Ann Guy and Alexander Morris.  *See* Suppl. Morris Decl.; Suppl. Guy Decl.  The court begins by addressing the withholdings pursuant to the attorney-client privilege, and then turns to the materials withheld under the deliberative process privilege.

*1.*     *Attorney-Client Privilege*

Exemption 5 prevents the mandatory disclosure of inter-agency documents that are protected by the attorney-client privilege.  *See Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 249 (D.C. Cir. 2016); *see also* 5 U.S.C. § 552(b)(5).  In the context of FOIA, "the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Judicial Watch v. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011); *see Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252–54 (D.C. Cir. 1977).  A communication is protected by the privilege if its primary purpose is "(i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (internal citation omitted).

a.     NETL's Withholdings

The court begins with Plaintiff's challenges to NETL's withholdings.  NETL relied on the attorney-client privilege to withhold or redact material in five groups of responsive documents: (1) portions of the Site Change Plan, emails and correspondence regarding the Negotiation Memorandum, correspondence with Mississippi Power Company, and other documents including a "[m]emorandum by Southern Company's counsel discussing Authority to Approve Relocation of Project," NETL *Vaughn* Index at 4–5; (2) "[e]mails and communications between NETL employees and NETL counsel," *id*. at 10–11; (3) communications between NETL staff and NETL counsel regarding tax and other issues, *id*. at 12; (4) "[e]mails and communications between NETL counsel, DOE [Headquarters] counsel and management, and Southern Company personnel," *id*. at 12; and (5) emails with DOE counsel and NETL officials and counsel, *id*. at 13.  Guy provides additional context about the subject matter of the withheld records and NETL's reasoning for these five withholdings in her Supplemental Declaration.  *See* Suppl. Guy Decl. ¶¶ 21–29.

Plaintiff challenges the withholding of "conversations between Southern Company's counsel and DOE's counsel" pursuant to the attorney-client privilege, on the ground that the privilege does not protect conversations between an agency attorney and an outside attorney. *See* Pl.'s Mem. at 9. This broadly-worded challenge apparently concerns the first and fourth groups of withholdings made by NETL, as those are the only two withholdings, out of the five identified above, in which Defendant's description of the withheld records involve Southern Company counsel. *See generally* NETL *Vaughn* Index; *see also* DOE Headquarters *Vaughn* Index. The first specific withholding is of "information showing external deliberations between DOE and Southern Company employees and its counsel regarding the costs involved in [the] changing of the site of the project and modifications and necessary approvals[.]" NETL *Vaughn* Index at 4. Guy elaborates, stating that the redactions to emails and the Site Change Plan are "part of back and forth discussions regarding potential site outcomes and a decision to move the site of Southern's [ ] plant." Suppl. Guy Decl. ¶ 22. Other redactions are to "emails between counsel for Mississippi Power and Southern Company's counsel relat[ing] to the development of Southern Company's TRIG project." *Id*. The other challenged withholding—from the fifth group of produced records—is to "portions of external communications and emails between NETL counsel and [DOE Headquarters] counsel and Southern Company counsel." NETL *Vaughn* Index at 12. Guy is silent as to this record. *See* Suppl. Guy Decl.

Defendant's withholding of communications involving Southern Company is improper. The privilege protects only "confidential communications between *an attorney and his client*." *Mead Data Cent.*, 566 F.2d at 252–55. Therefore, the privilege does not apply to communications involving agency personnel, the agency's attorneys, *and* a third party—Southern Company's counsel. *See id*. at 254 (explaining the limits of the attorney-client privilege). The inclusion of

Southern Company's counsel in such communications renders the privilege inapplicable. Additionally, NETL's and Guy's labeling of the information as "confidential" does nothing to bring these records within reach of the attorney-client privilege. While the information may be "confidential" in the sense that the exchanges between Defendant and Southern Company counsel were originally shielded from public view, the information does not pertain to legal advice by agency counsel to the agency, which is the relevant inquiry here.

Therefore, NETL's invocation of the attorney-client privilege to shield information exchanged with Southern Company is improper. Plaintiff's Motion is granted as to these specific withholdings. Defendant must disclose the four documents withheld under Exemption 5, based upon the attorney-client privilege, listed on pages 4 through 5 of NETL's *Vaughn* Index and the first withholding listed on the same Index at page 12.[2]

b.    DOE Headquarters' Withholdings

The court reaches a different conclusion, however, as to the DOE Headquarters' withholding of portions of four email threads. *See* DOE Headquarters *Vaughn* Index at 5–7, 10–13 (Nos. 10, 11, 15, and 16). As to these materials, Defendant provides context for the records and a sufficient basis for invoking the attorney-client privilege. Specifically, as to each of the withholdings, Morris sets forth the subject matter of the correspondence, the parties to the exchange, and why disclosure would reveal privileged information. *See* Suppl. Morris Decl. ¶¶ 44, 48–53, 57–61, 70, 74–78, 82–85. Additionally, Morris explains that all withheld information is confidential. *See id.* ¶¶ 51–52, 58, 60–61, 76–77, 84. And, unlike some of NETL's claimed attorney-client communications, the DOE Headquarters' withholdings do not include outside parties.

---

[2] NETL's remaining entries based on the attorney-client privilege are unchallenged by Plaintiff and therefore may be withheld.

In sum, Defendant has shown that the DOE Headquarters' records withheld based on the attorney-client privilege "(1) involve[ ] confidential communications between an attorney and his client and (2) relate[ ] to a legal matter for which the client has sought advice." *Judicial Watch*, 802 F. Supp. 2d at 200 (internal quotation marks omitted). Accordingly, Defendant's Motion is granted as to the DOE Headquarters' withholdings under the attorney-client privilege, and Plaintiff's Motion is denied as to those withholdings.

## 2. *Deliberative Process Privilege*

That leaves the material withheld pursuant to the deliberative process privilege. This privilege allows an agency to withhold responsive records if the documents "reflect[ ] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). The privilege only applies, however, to records that are both "predecisional" and "deliberative." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *accord Judicial Watch*, 847 F.3d at 739. As used in Exemption 5, "predecisional" material is that "generated before the adoption of agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Material is "deliberative" if it "reflects the give-and-take of the consultative process." *Id.*

The court gave Defendant the opportunity to supplement the record to explain why the withheld information is both "predecisional" and "deliberative." *See* Mem. Op. at 23. Attempting to do so now, Defendant proffers the supplemental declarations of Morris and Guy. *See generally* Suppl. Morris Decl.; Suppl. Guy Decl. Plaintiff, in turn, renews its blanket challenge to Defendant's invocation of the deliberative process privilege, arguing that Defendant has wrongfully withheld documents that do not predate the adoption of agency policy, are not

deliberative, or contain "external deliberations between Southern Company and DOE" and therefore are not covered by the privilege. *See* Pl.'s Mem. at 9–10. The sole specific objection it raises, however, is to the DOE Headquarters' withholding of the Negotiation Memorandum. *Id.* at 10. This leaves Defendant, and the court, having "to deduce what specific records the plaintiff is challenging." *See Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 174 n.42 (D.D.C. 2013).

a.     <u>NETL's Withholdings</u>

NETL asserts the deliberative process privilege as the basis for its complete withholding or redaction of a multitude of records: (1) "[e]mails of NETL personnel discussing actions necessary to modify the cooperative agreement for site change"; (2) "draft responses to [DOE Headquarters] for approval for repayment under the cooperative agreement"; (3) "other internal discussions and email communications"; (4) "[e]mails and correspondence relating to the Record of Decision"; (5) "repayment plan"; (6) "funding information"; (7) "an informal summary of conference call"; (8) "DOE's position on withholding of funds"; (9) "discussions on repayment plan"; (10) "comments concerning the Environmental Impact Statement"; (11) "internal memo from NETL's Chair of the CCPI Team"; (12) "draft memo to [DOE Headquarters] with mark-ups of the waiver of repayment"; (13) "talking points for meeting with [DOE Headquarters]"; (14) "draft letter requesting to modify terms of waiver of repayment"; (15) "327 pages of emails and correspondence . . . between DOE [Headquarters] and NETL personnel" containing "versions of the site change plan, the environmental impact statement, the record of decision (ROD), and discussions on project costs"; (16) "[i]nternal emails consist[ing] of comments and reviews of draft versions of the nondisclosure agreement"; (17) "emails between Southern Company and DOE counsel regarding licensing fees and technology discussions and comments on tax issues"; (18) "internal emails between contracting officers discussing proposed revisions to the project";

(19) "subcontractor claims"; (20) "draft waiver conditions"; and (21) "modification to cooperative agreement." *See* NETL *Vaughn* Index at 5, 10–11, 13. NETL's *Vaughn* Index groups these withheld records based on the round of production, rather than by subject matter.[3] Per the *Vaughn* Index, NETL made attorney-client withholdings in its fourth, eighth, ninth, and tenth productions. *See* NETL *Vaughn* Index at 5, 10, 11, 13. As to each of those four productions, the Index contains a one-paragraph "[j]ustification" for the agency's action. The court previously found these justifications to be vague, however, as they neither made clear that the withheld material "actually predates an agency decision" nor "identif[ied] a single agency action to which the withheld materials contributed." Mem. Op. at 21–22. In light of Defendant's failure to "put forward sufficient information to allow the court to determine whether the deliberative process privilege applies," the court denied Defendant's first motion for summary judgment as to these withholdings. *Id.* at 22.

NETL fares no better in this second round. The additional declaration provided by NETL's declarant, Guy, does little to tie the withheld records to specific agency decisions or explain their place in the agency's deliberative process. For starters, Guy addresses only some of the above-listed 21 different documents or groups of documents. Take, for example, the deliberative process withholdings to the documents produced in Defendant's eighth production, which are listed in the *Vaughn* Index as: "funding information," "an informal summary of conference call," "DOE's position on withholding of funds," "comments concerning Environmental Impact Statement," and an "internal memo from NETL's Chair of the CCPI Team." *See* NETL *Vaughn* Index at 10. Guy does not discuss these five records or groups of records in her Supplemental Declaration. *See*

---

[3] For example, in its fourth production of records, NETL withheld some or all information from the following documents: (1) "[e]mails of NETL personnel discussing actions necessary to modify the cooperative agreement for site change,"; (2) "draft responses to [DOE Headquarters] for approval repayment under the cooperative agreement"; and (3) "other internal discussions and email discussions." NETL *Vaughn* Index at 5.

Suppl. Guy Decl. ¶¶ 21–29.  Moreover, even when Guy elaborates on withheld material, she does so indiscriminately, making it difficult to discern the role of individual documents in the agency's decision-making.  For instance, the 327 pages of "emails and correspondence . . . between DOE [Headquarters] and NETL personnel" from NETL's ninth production, as described in the *Vaughn* Index, concern multiple subjects, including an "environmental impact statement," "the site change plan," "the record of decision," and "discussions on project costs."  NETL *Vaughn* Index at 11. Guy describes these records as containing "internal deliberations and opinions about the topics DOE needed to resolve before reaching a decision about whether to locate Southern's IGCC plant" and "timing and cost issues that DOE needs to resolve before developing a path forward for Southern's IGCC plant."  Suppl. Guy Decl. ¶¶ 28–29.  Such a catch-all description of over 320 emails is of little help.

Determining the propriety of NETL's assertion of the deliberative process privilege is an insurmountable task on the present record.  The deliberative process privilege "depend[s] upon the individual document and the role it plays in the administrative process."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1976).  The agency must establish "what deliberative process is involved, and the role played by the documents . . . in the course of that process."  *Id*. at 868.  Information regarding "the nature of the decisionmaking authority vested in the officer or person issuing the disputed document, and the relative positions in the agency's chain of command occupied by the document's author and recipient," are helpful in making this determination.  *Senate of the Commonwealth of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987) (internal citations and quotation marks omitted).  In short, the court's inquiry must be fact-dependent and document specific.  By grouping its records by production number, NETL fails to carry its burden.

To be sure, an agency is not obligated in every case to use a "document-by-document" approach to justify its withholdings; "it may instead do so category-of-document by category-of-document." *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994) (internal quotation mark omitted). But when using a categorical approach, the agency must ensure that "its definitions of relevant categories are sufficiently distinct to allow a court to determine whether the specific claimed exemptions are properly applied." *Id.* (cleaned up). While the Circuit does not prescribe a specific format for an agency's justifications of its withholdings, "[t]he need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp.*, 617 F.2d at 867). Here, Defendant's organization of records centered on the timing of the production, not on any identifiable criteria that would situate a defined group of records within the overall decision-making process. That approach does not give the court the information it needs to evaluate the privilege claim.

While the court refrains from making any final determinations as to NETL's withholdings at this juncture, the court offers some observations here to steer this case toward resolution. The court begins with Plaintiff's challenge to Defendant's withholding of the Negotiation Memorandum—the only specific objection Plaintiff raises as to Defendant's deliberative process withholdings.[4] NETL withheld, in full or in part, "[t]he Negotiation Memorandum and drafts of

---

[4] NETL's *Vaughn* Index identifies only the attorney-client privilege as the basis for its withholding of this Memorandum and its associated drafts. *See* NETL *Vaughn* Index at 4. Defendant now argues that the deliberative process exemption *also* serves as a basis for its withholding. *See* Suppl. Guy Decl. ¶ 23 ("[T]he Negotiation Memorandum" is "predecisional" because it is a "draft that [is] not in final form, and . . . deliberative because [it] reflect[s] internal deliberations regarding potential site outcomes for moving the site of Southern's IGCC plant."); *id.* ¶ 25 ("The Negotiation Memorandum and drafts . . . are deliberative because they reflect the back-and-forth internal deliberations between agency employees . . . . These documents are also pre-decisional because they discuss potential topics DOE needs to resolve before the meeting regarding DOE's path forward . . . and before DOE reached the final

the Negotiation Memorandum," on the grounds that those documents "reflect the back-and-forth internal deliberations between agency employees regarding what information needs to be included in the meeting" regarding the relocation of the plant and "show the differing opinion of the DOE employees on what topics should be discussed." Suppl. Guy Decl. ¶ 25. Plaintiff argues that the withholding of the final Negotiation Memorandum is improper because "it is a completed document—not predecisional, and not deliberative." Pl.'s Mem. at 10 (citing Suppl. Guy Decl. ¶ 25). As to this argument, it is unclear why Defendant believes that both drafts of the memorandum *and* the final memorandum are "predecisional." Indeed, Guy does not assert that all versions of the "Negotiation Memorandum" are drafts; in fact, her description suggests just the opposite. *See* Suppl. Guy Decl. ¶ 25 (referring to "[t]he Negotiation Memorandum *and* drafts of the Negotiation Memorandum") (emphasis added). The court also does not see any support for Defendant's claim that the final Memorandum is "deliberative," as that term is used in the FOIA context. The fact that the Negotiation Memorandum contains the topics the subcomponent wanted resolved before Defendant made decisions about relocating Southern Company's IGCC plant does not necessarily make it "predecisional." *See id.* The Memorandum very well may contain NETL's *final* decision as to those topics, thereby placing it outside the deliberations process privilege.

Relatedly, Defendant's understanding of Exemption 5 and "draft" documents is overbroad. Defendant asserts that the following documents are protected by the privilege: draft responses to DOE Headquarters; a draft memo to DOE Headquarters with mark-ups; the draft letter requesting to modify terms; draft versions of the nondisclosure agreement; and draft waiver conditions. *See*

decision about . . . relocat[ing] Southern's IGCC plant." (citing NETL *Vaughn* Index at 4)). As Plaintiff has had the opportunity to respond to this new ground, the court may consider it. *See Lazaridis v. U.S. Dep't of State*, 958 F. Supp. 2d 206, 207 n.2 (D.D.C. 2013) ("[The defendant] is not foreclosed from claiming different exemptions since it is raising them in the original district court proceedings, where [the plaintiff] has been given the opportunity to challenge [the defendant's] changed position." (internal citation and quotation marks omitted)).

NETL *Vaughn* Index at 5, 10, 11, 13. Although Guy does not expressly address these items in her Supplemental Declaration, Defendant argues broadly that NETL's withholding of "documents in draft form" is permissible because "[b]y their very nature, draft documents are predecisional in nature." Def.'s Mem. at 17. This is a misstatement of the law. "The District of Columbia Circuit has made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004). The deliberative process privilege extends "*only* to those documents that . . . were 'generated before the adoption of an agency policy' and may 'inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position.'" *Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 60 (D.D.C. 2014) (quoting *Coastal States Gas Corp.*, 617 F.2d at 866). Moreover, a document that was "predecisional at the time it [was] prepared . . . can lose that status if it is adopted, formally or informally, as the agency position on an issue." *Coastal States Gas Corp.*, 617 F.2d at 866. Guy's declaration does not reflect consideration of these principles.

Similarly, the agency does not appear to recognize that documents reflecting official policy are not protected, as they are not predecisional. *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). For example, the record described as "DOE's position on withholding of funds" (or a communication containing that position) presumably sets forth Department of Energy policy. *See* NETL *Vaughn* Index at 10. If so, that document is not "predecisional." Similarly, if the document NETL describes as an "internal memo from NETL's Chair of the CCPI Team" sets forth a NETL decision or edict or policy that, too, would not be covered by the exemption. *See* NETL *Vaughn* Index at 10.

Finally, to the extent Defendant seeks to withhold records that were shared or created with Southern Company, Exemption 5 does not shield them from disclosure. The deliberative process privilege protects only "inter-agency or intra-agency" communications. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001). The D.C. Circuit has recognized a limited exception for communications between the agency and outside consultants. *See Pub. Citizen v. Dep't of Justice*, 111 F.3d 168, 170 (D.C. Cir. 1997); *see also Klamath Water*, 532 U.S. at 11 (acknowledging the Circuit's adoption of the "consultant corollary"). But Southern Company is not a consultant. Therefore, it is unclear why Defendant believes that the deliberative process privilege provides a basis for withholding information that was exchanged with Southern Company, as such records were not "created for the purpose of aiding the *agency*'s deliberative process." *Pub. Citizen*, 111 F.3d at 170.

The court will give Defendant one last chance to provide sufficient justification for NETL's withholding of records under the deliberative process privilege. Unless Defendant produces a *Vaughn* Index (including any supplemental declaration) that provides sufficient detail about specific records or groups of records and their relationship to NETL's decision-making, the court next time will deny Defendant summary judgment as to these withholdings and order the records be disclosed. If needed, the court is prepared to review a representative sample of documents *in camera*.

b.    DOE Headquarters' Withholdings

In contrast to NETL's efforts, the DOE Headquarters' assertion of the deliberative process privilege easily satisfies Defendant's burden.[5] In his Supplemental Declaration, Morris methodically summarizes Defendant's justification for invoking the exemption. He both identifies

---

[5] Because of the court's decision as to the attorney-client privilege, it is only necessary to consider the deliberative process withholdings in Nos. 3, 7, 8, 9, 12, and 14 of the DOE Headquarters' *Vaughn* Index.

the decision to which the records relate and explains why the records are "deliberative." *See* Suppl. Morris Decl. ¶¶ 28–47, 53–56, 62–73, 78–81. In view of Morris' detailed supplemental declaration, as well as the absence of a specific challenge from Plaintiff, the court grants Defendant's Motion as to the DOE Headquarters' withholdings on deliberative process grounds.

### D.    Exemption 6 Withholdings

Finally, the court turns to the parties' arguments regarding Defendant's withholding of the names, telephone numbers, email addresses, and home addresses of Southern Company officials and personnel who worked on the Kemper Project under Exemption 6. *See* Mem. Op. at 24. Defendant redacted this information on the ground that the individuals' privacy interests in their names and other personal information outweigh the public's interest in their disclosure. *See id.*; *see also* Def.'s First Mem. in Supp. at 13 ("[T]he public interest in the disclosure of such information is nonexistent because it will in no way advance an understanding of the functions of government.").

Before turning to the substance of this issue, the court must explain how it previously came to decide that this issue was moot, and why that ruling was mistaken. In the parties' first cross-motions for summary judgment, Plaintiff challenged Defendant's declarations as insufficient to justify the withholdings, at least insofar as Defendant withheld Southern Company employees' names and positions. *See* Pl.'s First Mem. of P. & A. in Supp. at 12–13 (referring to Southern Company's names and e-mail addresses); Pl.'s Reply Br., ECF No. 20 [hereinafter Pl.'s First Reply], 6 (referring to the redaction of Southern Company employees' names and positions). Defendant, however, argued that Plaintiff's objection "appears to be moot" because Plaintiff had obtained the desired information from a public filing with the Securities and Exchange Commission. Def.'s First Reply 12. That claim rested on a remark from Plaintiff's senior

investigator, who stated in a declaration that "the redacted names also appear in versions of the same documents public[ly] filed with the Securities and Exchange Commission." *Id.* (citing Pl.'s Cross-Mot. for Partial Summ. J., Attach. 2, Decl. of Dan Zegart, ECF No. 15-2). Plaintiff did not directly respond to Defendant's suggestion of mootness. Instead, it asserted that the availability of the withheld information in the publicly available document demonstrated the inappropriateness of Defendant's redactions. Pl.'s First Reply at 7. Based on this back and forth, the court understood Defendant's mootness argument to cover all invocations of Exemption 6 and found that dispute to be moot. *See* Mem. Op. at 25–26.

The court now understands that its ruling went too far. The publicly available SEC filing does not contain all information withheld by Defendant pursuant to Exemption 6. Plaintiff continues to challenge DOE Headquarters' redaction of names in emails sent by Sierra Club Membership Services to the Secretary, *see* DOE Headquarters *Vaughn* Index at 22–31, and NETL's redactions of the names of "individual workers and key personnel employed by Southern Company" from documents, including several Cooperative Agreement Amendments, versions of the Negotiation Memorandum, and "commitment letters submitted by subcontractors and proposed business partners," *see* NETL *Vaughn* Index at 2–3, 5. Therefore, there remains an ongoing, justiciable dispute over Defendant's Exemption 6 redactions.

Exemption 6 permits an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *see Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997). "'Similar files' include 'detailed Government records on an individual which can be identified as applying to that individual.'" *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146–47 (D.C. Cir. 2015) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1124 (D.C. Cir. 2004)). In assessing

an Exemption 6 withholding, the court must weigh the "privacy interest in non-disclosure against the public interest in the release of the record in order to determine whether, on balance, the disclosure would work an unwarranted invasion of personal privacy." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999). The court must first decide "whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Prison Legal News*, 787 F.3d at 1147 (cleaned up). "[I]f no significant privacy interest is implicated, FOIA demands disclosure." *Multi Ag Media, LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (cleaned up). The government may satisfy its burden of showing a substantial invasion of privacy by affidavits containing "reasonable specificity of detail rather than merely conclusory statements." *Prison Legal News*, 787 F.3d at 1147. If the privacy interest is substantial, then the court engages in balancing the individual's right of privacy against the public interest in disclosure. *Id.* The requesting party bears the burden of coming forward with a valid public interest in the information. *See Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

Based on the present record, the court cannot accept Defendant's Exemption 6 withholdings. Defendant's declarants simply parrot the standard for Exemption 6, *see* Dunlap Decl. ¶ 51; Def.'s First Mot. for Summ. J., Decl. of Alexander Morris, ECF No. 13-4, ¶ 33, rather than explain why disclosure would compromise a *substantial* privacy interest, *see Multi Ag Media*, 515 F.3d at 1229–30. This will not do. An agency must provide affidavits containing "reasonable specificity of detail rather than merely conclusory statements" to establish a substantial invasion of privacy. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). This defect alone is a sufficient basis to deny Defendant's motion.

Additionally, Defendant has failed to grapple with the fact that the privacy interest for the disparate individuals whose names appear in the records—from Sierra Club members, to

subcontractors, to Southern Company "key personnel"—may vary. In *Prison Legal News*, the D.C. Circuit made clear that an agency's conclusory assertions of privacy interests for a group of individuals will not stand when there are meaningful differences among those individuals. *See* 787 F.3d at 1148–51. At issue in that case was the Bureau of Prisons' redaction of names and other personal identifying information of individuals who had filed claims against the agency. *Id.* at 1147–48. In explaining its withholdings, the Bureau of Prisons "lump[ed] the privacy interests of all claimants and any perpetrator or witness . . . into categories based on the *type* of document in which the individual's information appears." *Id.* at 1149. This "categorical approach" was improper, the court held, because it made no distinction among individuals with a "wide range of claims covering various degrees of privacy interests." *Id.* at 1150. The same is true here. Defendant has not, for example, shown why "key officials" for Southern Company, a publicly-traded energy corporation, have the same or similar "substantial" privacy interests as, say, lower-level Southern Company employees and Kemper Project subcontractors. A categorical approach can be appropriate. But Defendant must explain the privacy interests at stake as to each appropriately categorized group of individuals whose names and identifying information it has withheld. *Cf. Judicial Watch*, 726 F.3d at 215.

There is one more basis for denying Defendant's Motion as to these withholdings: Defendant has not addressed the private interest asserted by Plaintiff. As noted, if the government establishes a substantial privacy interest in the withheld records, then the court must weigh that interest against the public's interest in the disclosure. *See Lepelletier*, 164 F.3d at 46. Here, Plaintiff asserts a public interest in knowing "who is responsible for using and managing government funds." Pl.'s Mem. at 11. In any subsequent summary judgment motion, Defendant

will have to explain why this claimed public interest is not sufficient to overcome the asserted substantial interest in privacy.

Accordingly, the court denies the parties' Motions with respect to the Exemption 6 withholding.

## IV.     CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Defendant's Renewed Motion for Summary Judgment and Plaintiff's Cross-Motion for Partial Summary Judgment. In sum:

1.      Plaintiff's Motion is granted as to the documents shared with or created by Southern Company, which Defendant withheld under Exemption 5 based on the attorney-client privilege.

2.      Defendant's Motion is granted as to: (a) the adequacy of the search; (b) the withholdings made under Exemption 4; (c) the remaining withholdings under Exemption 5 pursuant to the attorney-client privilege; and (d) the DOE Headquarters' Exemption 5 withholdings under the deliberative process privilege.

3.      Both parties' motions are denied as to NETL's withholdings under the deliberative process privilege under Exemption 5 and its withholding of names and other personal information under Exemption 6.

The parties shall meet and confer and, no later than October 1, 2018, propose a schedule for a final round of summary judgment briefing.

Dated:  September 19, 2018                                    Amit P. Mehta
                                                             United States District Judge